No. 23-1512, Mr. Pack again. Thank you, Your Honor. I think this time you've saved three minutes for rebuttal. Is that correct? That's right, Your Honor. So, Your Honor, I'd like to begin by making it clear that with respect to the PTAB's final written decision order, we are contending there were two legal errors, not just a substantial evidence challenge. And I think I can demonstrate that, actually, by just walking you through one portion of what that is. Can I just ask you the question I asked your friends in the previous case? If we disagree with you here and affirm, does that get rid of the case we just heard from, too? Well, we understand that to be the case. Okay, thanks. I just wanted to give you an opportunity to be on the record. So, Your Honor, let me walk you through, I think, very concisely here, some of the things that we saw in Apple's response in the red brief. If Your Honor is turned to page two of the Apple response brief, and what you will see there is that Apple notes, just consistently with what you heard in the ITC case, on the confirmation step, that detection and confirmation are two different functions, two different steps. And that's a very important part of the invention being cited. And this is detect based on PPG data, the presence of an arrhythmia, and then confirm the presence of the arrhythmia based on the ECG data. Clearly two steps. Then you turn to page 14 in the same response brief. They acknowledge that the dependent claims of the 731 and the 499 patents recite using a machine learning algorithm to detect in the language of the 731 or determine using the language of the 499 patent the presence of an arrhythmia. So clearly we're not talking about machine learning in those claims for ECG confirmation. We're talking about machine learning for the initial detection step. And just to give you a little bit of background, as we noted in my intro, Your Honors, the PPG data does not have the reliable hallmark indicators of most common forms of arrhythmia, such as P wave, absence, or atrial fibrillation. Machine learning looks at millions of data points to be able to detect patterns that may not be visible, even to a trained cardiologist. And so what we're talking about in these dependent claims is using machine learning algorithms trained on PPG data for the initial detection step. So that's the element that they have to show, that the PTAB had to show. If you look at page 9. Before you refer more pages, you suggested there were two legal errors. Yes. Can you tell me what they are? Yes, Your Honor. So the two legal errors are this. The first legal error is that what actually the PTAB found with respect to the Shmuley reference, which was the primary reference that Apple was relying on, is the following. We agree with Petitioner that after an ECG is measured, it would have been obvious to confirm arrhythmia using a machine learning algorithm. Confirm. So the obviousness finding from the PTAB, after crediting all the Apple arguments, was simply that it would have been obvious to use machine learning to confirm, based on ECG and other data, not detecting arrhythmia in the first step using PPG data. And that's the legal error. And the second legal error, Your Honor, is the mixing of, and you can see this in page 57 of the Apple brief. Despite relying on these two steps being different, what Apple argues now, as a basis to support the PTAB's finding, is a machine learning algorithm trained to confirm an arrhythmia is necessarily also trained to detect that arrhythmia. So after having spent all of this time at the ITC arguing these are two distinct steps and acknowledging all the intrinsic record, because they cannot find the use of any machine learning using PPG data to detect, what they're now arguing and what they encourage the PTAB to do is to conflate two distinct steps of an invention. So that's the second legal error, Your Honor. And that's found at page 57. And that's because if you look at page 31 of the red brief, Your Honor, you will see the annotation is important because it really helps establish what Apple is trying to do here. This is the figure of SHMULI that they're relying on and the PTAB relied on. And if you look at that figure, you have three boxes. Detect irregular heart condition. And the input into that is the SPO2 input, which is the PPG. You have detection parameters, which are some of the input parameters that are provided into the detection step. Then you have the search correlation. And what you see, the box that Apple drew, which is the argument that they presented to the PTAB, is that this entire three boxes represent what they call confirming the PPG diagnosis. And so what they're pointing to as the machine learning is the search correlation box, which is to the right. They've only identified at best one machine learning algorithm that Apple and the PTAB contend is used for the generation of the search correlations. But that box is the same place that Apple and the PTAB is pointing to for confirmation. And so both cannot be true. And that's the reason why there is a legal error here. And furthermore, it goes on to say in the red brief at page 32. A little confused why you're calling this legal error. It still sounds awful like substantial evidence to me when you're pointing to specific parts of the prior art and saying it doesn't support the conclusion. No, Your Honor, because what we're saying, the reason why I'm saying it's a legal error is the ultimate conclusion that the PTAB found, as a predicate for the obviousness of this limitation, was that it's obvious to use machine learning for confirmation using ECG data. So it's a legal error to take that finding and then render obvious and invalid a claim that is about machine learning for detection using PPG. That's the legal error. And that's why we're not, you know, we've contested substantial evidence based on the experts. But I really want to focus on this because this is different than saying the experts' evidence shouldn't come in based on credibility reasons. What we're saying is the finding, the ultimate predicate finding that the PTAB reached based on arguments, as we're seeing now, how Apple had to draw the boxes in Shmuley was about a different concept altogether, which is using machine learning for confirmation that involved ECG data. And that's very obvious. It seems to me that the board reached that legal conclusion based upon its assessment of the evidence and what the evidence taught, including the testimony of Dr. Chapman. And I don't know, to me, it's hard to characterize this as a legal issue when it's all about what the evidence shows. And whether the evidence taught detecting or confirming, that's a substantial evidence question. No, Your Honor, because in this case, the conclusion, as stated in the PTAB's final written decision, had nothing to do with detection. So the ultimate obviousness finding, even if you credit what the PTAB did under the substantial evidence standard, reaches an ultimate conclusion that says it would have been obvious in light of the Shmuley teachings to use machine learning for confirmation, not detection. And the legal error, Judge Lynn, is that you cannot then take that finding, urged by Apple, and then legally conclude that a separate step in the dependent claims about detection using PPG data is also rendered obvious. There's just no support for that. And that's the reason why we think this is a legal error to make that leap. I want to talk to you about your discovery and secondary considerations point. It looks like you never made any secondary considerations evidence contention to the board, even though, if I follow the timing correctly, the administrative law judge at the commission had already made findings about copying in a publicly available decision by the time you got to the oral hearing before the board. If that is correct, aren't these issues waived or forfeited many times over by you? No, Your Honor, because, as you saw, much of the evidence on the secondary consideration involved Apple's confidential documents. Right, but is it correct that the initial decision of the ALJ was out by the time you were in front of the board? All the briefing had been done, Your Honor. So what happened was, let me go through the timeline here. I'm sorry. You don't have to write down the details. Are you saying you did not have the institution decision at the time you went to the oral hearing in front of the board? You mean the public, the ID? Yes, the ID. I'm sorry, the initial determination. Yes, the initial determination. We did have the initial determination. Right, so why not present that or make an effort to present that to the PTAB and to say, there's other secondary consideration evidence we'd like to present. You may be able to infer some of it from this public document.  You made no effort whatsoever. The reason for that, Your Honor, is that under the PTAB rules, we had to put all of our arguments in the written submissions. The PTAB can always make exceptions to its rules in extraordinary circumstances. You have to give them the opportunity to do it. Yes. And you didn't ask them, right? You didn't make a motion to supplement the record or file a supplemental brief, or you didn't even mention it at the oral hearing. Right. And the reason for that, Your Honor, is that I, along with my colleagues, we were subject to a protective order. Yes, and you could have told the board that we have additional information that's subject to a protective order that we think is relevant to your case. You didn't have to actually submit it. The board probably would have liked to have done about it. We did alert the board to the issuance of the public ID, and I did indicate to the board that they should take judicial notice of that. But, Your Honor, you're correct that I did not raise the secondary consideration evidence specifically. If I think that you clearly forfeited or waived these arguments, do we nonetheless have discretion to find maybe exceptional circumstances and reach this issue if I'm uncomfortable with what happened here? And if so, how would that argument go? Yes, the argument would go as this. Because this goes back to there is no waiver of a self-enforcing duty of candor. So the argument that we're raising is not whether we brought secondary considerations argument before the patient. But you waived this argument, too. You never told Apple you thought that they had a self-actual, an automatic sui sponte obligation to produce this discovery, did you? I don't think we have to, because the law is very clear that the self-enforcing duty does not require any action by any other party. The point that we're making, the reason why we think this is an issue that Your Honors should address, is, as Your Honors know, definitive rules have been changed to exempt ITC proceedings. And in this case, we had two tribunals dealing with the same patents. In the future, there will be cases where two tribunals will be dealing with the same prior art as well. And what we have now is Apple, under its self-enforcing duty, had the obligation, certainly by the January 2022, when we communicated specific documents to them and said, these are the documents we would like to seek discovery from you at the PTAB. And they threatened sanctions against us, even if we were to use a... Don't you think you have to raise that argument to the board rather than to us in the first instance? Even if it is Apple's obligations, you have to point out that they're not meeting their obligations to the board, so the board can take action. That's not something we should be doing for the first time on appeal. We believed that once we put them on notice, that we did not have to take any further action, that they had a self-executing duty of counter. And because of that, they did not... There was no secondary evidence ever produced by Apple in this case, starting from January of 22 to when the staff attorney came out and found that there is evidence of copying and evidence of industry praise in Apple's files. Do you think if you were in a district court and you asked for discovery responses and you felt they were insufficient and you didn't raise that to the district court and allow the district court to remedy it, you could raise it for the first time on appeal? No, we think this is different than discovery. Why? And the difference is this, Your Honor, because they characterize this as a discovery dispute about whether we could have served discovery requests on Apple. But that's not the issue here. The issue is this is a discovery obligation by Apple to produce... Many district courts or district judges have standing orders that have similar self-enforcing duties, so I don't think that gets you very far. But that's the basis. Okay, Mr. Packer, you've exhausted all your time. Yeah, thank you, Your Honor. But we ask you a lot of questions, so I'll restore your full three minutes. Oh, thank you. Mr. Davies. Your Honor, I'm happy to start with the discovery issue we were just discussing, if that's preferable. It's up to you. It's your time. If you have questions, we'll ask you. Okay, fair enough, Your Honor. So let's start at the beginning. We can go back to the claims. I mean, it might help for me, actually, to clear up this, you know, what he was talking about, about confirmation versus detecting. Sure. Because I thought that the board addressed that. The board did address it, Your Honor, and it may help to look at Figure 7. This is on Red Beef, Page 31. What page was it? Page 31, Your Honor. Thank you. And this just, I think it can set out the claims and what we're talking about here. And we can start with Element 38, where it says, Detect Irregular Heart Condition, because that is what we've been talking about. And if you move to the right, you see Detection Parameters, Search Correlation, and then in Element 49, you see what means Record PPG and ECG Measurements. So what that shows is that the ECG goes through Search Correlation to Detection Parameters, and it's confirming the irregular heart condition. The other way to see it even more intuitively, perhaps, is to start at the top left, where it says Start. You've got the PPG measuring the heart. Regularly, and then if it detects a problem, detect it, get to the ECG, and that ECG confirms. So Figure 7 is showing what the claim, the first claim says, which is confirm the presence of arrhythmia based on the ECG data. And that's what we just went through. You can see how the ECG data is confirming the presence of the arrhythmia. Did the Board rely on the same Search Correlation box here in SHMULI to satisfy both the confirming and the detecting? The detecting is about the PPG, while the ECG is about the confirming. So if you look at Element 49, that SP02 refers to PPG, so it's the same box you're on in the sense that it's Element 49. And they're both used as part of the correlation, but one of them does the detecting, and one of them does the confirming. And where does the Board clearly make a finding on detecting versus confirming? So confirming is at the Board App 93-94. I'm sorry, I can't hear you. Appendix 93-94. 93-94 is confirming, and detecting is? It's the same area you're on. Same what? The same... Same page? I just didn't hear what you said. Yes, Your Honor. So if you look at the block quote on Appendix 94, SHMULI, continuously measuring, measuring the ECG to confirm. So measuring the ECG data upon detecting an irregular heart condition. And you have Dr. Chapman, who gives us context for what's going on here, which is that the PPG does the detecting, but it's not very good at being portable. While the ECG is the gold standard, it has those 12 wires, and so putting the PPG portable helps the irregular detection, and when it sees a problem, that's when you do the ECG. The machine learning you can also see from Figure 7, since we're on Figure 7. The detection parameters are taught to change, or can be adjusted based on the machine learning language. And that's... And that is a... That... So Board Appendix 110 is describing the limitations of the machine learning claims here. So I do think it's important to just step back and talk about why the machine learning claims here are invalid. And that's because what's going on here, I think, is that people are using sort of the magic technical words, machine language, to expect some sort of deference. But they are not complicated words, they are simple words. And that's the key thing to recognize. And it shouldn't determine anything that is not already stated by the board. To move on to the secondary considerations issue, the waiver issue here is so dramatic that... Well, I mean, when they did tell you they thought the secondary consideration evidence from the ITC was relevant, why didn't you submit it to the board? We didn't... Relevant is not quite the right word. I mean, they were saying it was inconsistent, and that was not our position. We did not think it was inconsistent. But on the waiver point, Your Honor, I mean, we filed our petition for review in June 2021. And we used the word obvious. And if their position was that secondary consideration brought that into question, they should have raised it with the board at some level. But we didn't see it until May 2023 in this setting. Well, I mean, with regards to the industry praise and the stuff that was accessible to them, that's one thing. But what about the copying evidence? I mean, they didn't get it until the ITC hearing, right? That was just your confidential information. They certainly could have tried to get it sooner. But yes. But it's not... On the waiver point, the question is, did they make the legal argument? I mean, they didn't cite the regulation. They didn't go to the PTAB, which has so many procedures. They didn't file it in the patent owner response. They didn't file it in the SIRA reply. It didn't come up at the hearing. There were all these times when it could have been raised. But didn't you all... They did ask you to provide that evidence. Yes, they asked it as part of a routine discovery request, and that's at the... You responded with a threat, essentially, that it would be a violation of their obligations to the commission to even pursue it. You refused to even have a discussion with the board about it, I believe. We didn't refuse to have any discussions, Your Honor. And I'm not... They asked you to... I mean, we said, look, it clearly falls within the protective order. Go and ask and try and get it revised. And they just didn't do that, which they've done in other settings. And so, it's a busy... It's a quick proceeding. They're on a lot... It's not like the standard district court discovery. And so, it just didn't make the cut for them. You don't think that amounted to a bit of gamesmanship, that you're hiding behind the protective order? No, Your Honor. And I think this... I mean, here you had an ITC finding that that evidence was sufficiently strong to overcome a prima facie showing. And that's a rare circumstance. And yet, you just said, well, no, no, no. It's... We've got a protective order. We're not going to provide it. Well, first off, Your Honor, we've submitted 28 data letters, but the CTAP agrees with Apple that this information is not relevant to these sorts of patents. So, it's not gamesmanship, Your Honor. It's us just following the rules, which is... What about their argument that this is sort of self-enforcing, this idea of your submitting this evidence as part of the routine discovery? In a sense, it's self-enforcing. Certainly not your burden to produce secondary consideration evidence, but nonetheless. Right. But it's also very narrow. It may be self-enforcing, but as those rules often are, it's very narrow. And the Board has said what inconsistent means. And we discussed this. And I read brief at 77 to 78. If you have a test and you have two results, and one is good and one is bad, then you have to disclose both. But that's very different than what's going on here, where we're saying something is obvious. They're coming back and saying some sort of secondary considerations theory, which we don't agree with and which the PTAP doesn't agree with, is inconsistent. That is just not how the PTAP... Yes and no. I understand what you're saying, but you have to admit that secondary consideration evidence is part of the gram factors. It's part of the obviousness analysis. So it's a little difficult to say that it's not directly opposite to your position. It's not. As we see that evidence, Your Honor, and as the PTAP agrees with us, it is not directly opposite. But also don't remember that they could have started... They had plenty of other secondary considerations evidence that they think is relevant. The public praise, their sales, but they don't ever bring that up either. And so it's not as if we didn't... The parties just didn't focus on that because it was a fast-moving procedure and that's not what happened. But it was not gamesmanship. Again, this was... It goes from June 2021, where we say obvious, and then this issue comes up in May 2023. If that is not waiver, then that should be waiver. And in this context where we're trying to understand what the PTAP means by its own regulations, PTAP has already said what it thinks of this specific case. As the appellate court, you have to give that so much deference to just read their rules the way they read them, both generally and in this case. And you have the waiver on top of that. You referenced the 28J letters. I'm not sure that I interpret them the same way that you do. My understanding is that in those subsequent IPRs, I think it's for the 956 to 415, the board had the secondary consideration evidence in front of it and considered it and seems to have thought it was at least relevant to its obviousness determination. As we've said, it's always relevant. It does not suggest that the prudent course here would be to give the board a chance in the context of the prior art here and the specific patents here to take a look at what the commission said was evidence of copying. Your Honor, two responses. The 28J does say petitioner provides a reasonable basis for believing that the allegedly known evidence of secondary considerations did not apply to the challenge patents. They agree that we took a reasonable position. That goes to the self-enforcing duty and whether you had an obligation to produce it. I'm asking a different question. Why shouldn't we say that the totality of circumstances here, including the waiver, makes this exceptional and excuse the waiver and let the board have, in the context of these patents that two cases are turning on, consider the evidence that the commission found was in some way strong? Well, we know the board is right. As I just said, they think this was not inconsistent with our position. That's the argument. The argument that they're making is for a regulation that we didn't comply with the regulation. I guess you're not being clear in my question. I'm not getting to whether or not it's so inconsistent that you had an obligation in a self-enforcing way to produce it. I'm saying it seems clear that the evidence is relevant to the obvious misdetermination that we're reviewing, but yet the entity we're reviewing never had the chance to consider what may be highly probative evidence. Your Honor, it's important to keep in mind here the purpose of the PTAB process. Congress set it up with a very specific goal, which was there were too many improper patents being issued. We need an efficient system. It's a quick process. There are rules about what arguments you can make. There are rules about how long the PTAB has to offer. If based on this record, with such a serious waiver problem, you were going to remand, then that is not what Americans in Vents Act was supposed to do. In district court, maybe that's a different sense, but this is an agency procedure that Congress set up to deal with a serious problem. It's supposed to move quickly, and I don't think this is the time to start being... Is it not a problem that we have in front of us today two different obviousness determinations from two government entities that weren't both privy to the same evidence that could be highly probative of the decision they had to review, they had to make? I mean, Congress is clear about who is the proper agency for this sort of situation. It's the Patent Office. These are patent documents. Right, and it's the Patent Office that didn't have the evidence. Wasn't a significant portion of the evidence that was available to the ITC also available to a live court to submit to the board in its patent owner's response? Yes. Just the copying evidence that was in your possession? Yes, Your Honor. So they made no attempt at a secondary consideration argument at all, as opposed to just not having a maybe critical piece of evidence, but not the only piece of evidence. Yes, Your Honor. Certainly, that is one additional reason not to remand, that they just didn't try. Yes, but the Patent Office does have a specific role in this setting. It's not two agencies of equal weight. That's in the Fresenius case. That's in the old reliable case. The PTAB has a very specific role, and it is not one that it should be easily subject to remand. If you don't have anything else. Thank you, Your Honor. Thanks. You have three minutes. Okay, thank you. It comes right up to me. Thanks, Lee. Why should we save you on secondary consideration when you didn't make any attempt to put on a secondary consideration case at all? I understand this copying evidence is important, and it was important to the Commission, but it was also important to the Commission the industry praise, and you certainly had access to that, but yet you didn't put that in as a secondary consideration case. You didn't put any secondary consideration arguments in, right? We did not style it as a secondary considerations argument, Your Honor. We did put into the record in the patent owner's response the FDA approval as well as one of the papers that showed praise. We didn't believe, without access to Apple's confidential information, that we had enough before the PTAB to mount a secondary considerations challenge based on the dearth of the evidence that we had relying purely on. But, Your Honor, we did submit some of that evidence. We noted that during the hearing with the PTAB. But only in connection with motivation combined. Motivation combined, right, because we didn't believe that we had enough to overcome underground factors. One thing I wanted to note, Your Honor, is the relief that they're saying that we should have undertaken is go to the ITC and get permission to modify the protective order, but we cited this case, the certified lighting case, where a certain lighting case at the ITC, where that's exactly what the patent owner tried to do is to get the seek-leave to amend the protective order. Apple opposed that and successfully opposed it. And the ITC has said that we're not going to modify the protective order. Sure, but if you'd asked the board, and the board had said we want this information, there would be some further pressure for the ITC to modify its protective order. Or perhaps the board could also take it under a protective order. That's what we tried to do in the email. We said we're not going to... But we didn't try to do it with the people that could actually effectuate it, which was the members of the board. Right. But what the board has said in prior decisions, Your Honor, is Garmin case, where they said we're not going to allow discovery without particularized reasons with respect to secondary considerations. And so we needed to be able to... Don't you think you had a pretty particularized reason here once you had the ITC decision on this? I mean, it is unspathomable to me that when you got this decision, you didn't go to the board and say, we have very significant information bearing on obviousness that we can't provide to you because it's under a protective order, but we think we should be able to do it. And that the board would have just said, no, we're not going to let... Not only significant evidence, but a finding by another agent that it was significant. We understand your point, Your Honor. And I think we felt that we were relying on their self-enforcing duty and we did not have evidence and they were threatening sanctions against us for mentioning it. And we were trying to be mindful of our protective order obligations. Your Honor, if I could just say one last thing about the... Quickly.  I think what you heard from counsel is exactly our point on both Lee as well as the Shmuley reference. The confirmation is different than detection. All that the board found at the end for both Lee and for Shmuley is that it would have been obvious to use machine learning for a confirmation. There was no finding or conclusion at the end about the detection step and that's why we believe, as a substantive matter, setting aside the secondary considerations, that this decision cannot be supported. Thank you. Case is submitted.